John A. Conkle (SB# 117849)
*John.Conkle@ThompsonHine.com*
Amanda R. Washton (SB# 227541)
*Amanda.Washton@ThompsonHine.com*
**THOMPSON HINE LLP**
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2351
Phone: 310.998.9100
Fax: 310.998.9109

Ernest Edward Badway *(Pro Hac Vice forthcoming)*
*Ernest.Badway@ThompsonHine.com*
Brian P. Lanciault, Jr. (*Pro Hac Vice forthcoming*)
*Brian.Lanciault@ThompsonHine.com*
**THOMPSON HINE LLP**
300 Madison Avenue, 27th Floor
New York, New York 10017-6232
Phone: 212.908.3945
Fax: 212.344.6101

Attorneys for Plaintiff
Canter Strategic Wealth Management, LLC

UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CANTER STRATEGIC WEALTH MANAGEMENT, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL BERNIER; LPL FINANCIAL, LLC; and DOES 1 to 10, inclusive,<br><br>Defendants. | CASE NO. **'24CV2439 W    JLB**<br><br>**COMPLAINT FOR:**<br><br>**1. MISAPPROPRIATION OF TRADE SECRETS, 18 U.S.C. § 1836**<br>**2. MISAPPROPRIATION OF TRADE SECRETS, CALIFORNIA UTSA**<br>**3. BREACH OF CONTRACT**<br>**4. VIOLATION OF CALIFORNIA BUS. & PROF. CODE § 17200**<br>**5. TORTIOUS INFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC RELATIONS**<br>**6. BREACH OF FIDUCIARY DUTY**<br>**7. BREACH OF DUTY OF LOYALTY** |

8.  **VIOLATION OF CALIFORNIA PENAL CODE §496**

9.  **VIOLATION OF CALIFORNIA PENAL CODE §502 AND**

10. **CONSPIRACY**

**DEMAND FOR JURY TRIAL**

Plaintiff Canter Strategic Wealth Management, LLC ("Canter" or "Plaintiff") brings this action for damages and injunctive relief against defendants Michael Bernier ("Bernier") and LPL Financial, LLC ("LPL" and, together with Bernier, "Defendants"). Bernier is a former Canter employee who violated his professional and contractual obligations to Canter.  On the eve of his resignation and in furtherance of a covert plan to unfairly and unlawfully convert valuable Canter business opportunities and relationships, Bernier misappropriated Canter's confidential and proprietary information, including trade secrets, pilfering this information from Canter's data management systems.  He then deleted files and folders on Canter's computer system to cover his tracks. Less than a day after his misappropriation and concealment, Bernier resigned from Canter, took up employment with Canter's competitor, LPL, and immediately began using the confidential information and trade secrets to compete with and solicit Canter's clients.

LPL, for its part, knew full well that the information Bernier had taken, and was using to benefit himself and LPL, was taken from Canter. Brazenly, and after Canter explicitly informed LPL about Bernier's theft, LPL began soliciting Canter's other Canter employees, LPL continues to receive the fruits of Bernier's theft, as LPL continues to intentionally and knowingly take Canter's clients with the aid of Bernier and the stolen information.

Canter has suffered, and continues to suffer, monetary damages and non-pecuniary harms as a result of Bernier's and LPL's misdeeds. In support of recovery, Plaintiff asserts as follows:

## INTRODUCTION

1.     First thing in the morning on October 23, 2024, Bernier resigned from Canter. Unbeknownst to Canter, less than 24 hours earlier, however he had

surreptitiously accessed Canter's data management software and rifled through Canter's confidential and proprietary information, including trade secret information. On that single day, Bernier accessed confidential Canter client information for nearly twice as many clients as he accessed, on average, each day in the prior months. There was no legitimate purpose for doing so, given that Bernier had already planned to resign and begin working for LPL.

2.    The Bernier LPL plan to take Canter's confidential and proprietary information, including trade secrets, months was planned months before Bernier's resignation.    Bernier's investment adviser registration with the United States Securities and Exchange Commission ("SEC") was transferred to and associated with LPL the **very day he resigned** from Canter, October 23, 2024, something that could not have been accomplished without malice aforethought and knowing coordination on the part of both LPL and Bernier.

3.    Canter's investigation of Bernier's conduct, which is ongoing, has revealed that for months prior to October 23, 2024, Bernier had systematically accessed Canter's confidential information, manipulated Canter's data management system to cover his tracks, and downloaded, copied, and printed numerous documents and files containing Canter's confidential trade secrets, including without limitation, Canter's trade secrets concerning customer profiles, investment profiles, tax planning analyses, and similar sensitive and strategically valuable information that Canter goes to great lengths to protect and which, if disclosed to third parties (or a competitor like LPL), would cause substantial and irreparable harm to Canter.

4.    Perhaps most egregiously, as Bernier maneuvered through Canter's systems pilfering its confidential information and trade secrets, Bernier sought to cover his tracks by actively **deleting** file folders and files, some of which Canter has been unable to retrieve. Such spoliation of evidence of his misconduct illustrates Bernier's nefarious intent to steal from Canter and inflict harm on its business.

**THE PARTIES**

5.    Canter is a limited liability company organized under the laws of the state of [State of California] with its principal place of business in La Jolla, California, and a SEC registered investment adviser with over $300 million in assets under management ("AUM").  It provides financial planning services to clients, ranging from investment advisory services to tax, healthcare, retirement, and estate planning.

6.    Defendant Bernier is an individual residing within the State of California. Upon information and belief, Bernier regularly conducts business out of an office located at 4707 Executive Drive, Suite 250, San Diego, California.  From January 23, 2019, through October 22, 2024, Bernier was registered with the SEC as an investment adviser associated with Canter. As of October 23, 2024, Bernier's registration was associated with LPL.

7.    Defendant LPL is a limited liability company and SEC-registered investment adviser and broker-dealer. According to its SEC registration records, LPL's principal place of business is located at 1055 LPL Way, Fort Mill, South Carolina. LPL also maintains and regularly conducts business out of its office located at 4707 Executive Drive, San Diego, California.

**JURISDICTION AND VENUE**

8.    This Court has subject jurisdiction pursuant to 28 U.S.C. § 1331 because the claims asserted herein arise under federal law. The Court also has subject matter over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9.    Personal jurisdiction is proper over Defendants because each resides in, regularly transacts business within, or may be found in the State of California and the acts and events giving rise to the claims alleged herein occurred within this District.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides within this District and a substantial part of the events giving rise to the claims alleged herein occurred within this District.

# FACTUAL ALLEGATIONS

***Canter's Business***

11.    Canter is a registered investment adviser that provides asset management and financial planning services to individuals, families, and institutions. Canter is located in San Diego, California, but it services clients throughout the country.

12.    Canter provides its clients with an integrated financial management strategy that prizes improved financial outcomes through coordinated management strategies that cover traditional financial investment products, real estate, tax planning, and healthcare planning.

13.    Canter partners with individual investment advisers to provide them a platform that fosters business and client growth through strategic marketing opportunities and lead generation on the front-end, and then streamline client service on the back end with top-of-line technological solutions and back-office support.

14.    Over the past five years, Canter has seen tremendous growth through its unique strategies to both recruit investment advisers and obtain new clients who entrust Canter with their financial well-being. In fact, Canter's assets under management ("AUM") has consistently grown in each of those years.

15.    To accomplish this and maintain its competitive advantages, Canter has developed extensive and valuable confidential and proprietary business information, including information that constitutes trade secrets.

16.    Canter maintains confidential, proprietary, and trade secret information in secure data repositories that are access-restricted, password-protected, and consistently monitored for improper intrusions or access.

17.    Canter maintains its sensitive information within a secure network environment that is only accessible to Canter and its employees and other authorized personnel who may only access such information for the purpose of Canter's business.

18.    In addition to deploying technological security measures to protect its confidential, proprietary, and trade secret information, Canter also requires each of its employees and other personnel to agree to strict confidentiality obligations through which they agree to maintain in strict confidence, and not to disclose to any unauthorized third parties, all of Canter's confidential, proprietary, and trade secret information.

19.    Canter regularly requires its employees who have access to its data repositories and confidential, proprietary, and trade secret information to review, affirm, acknowledge, and agree to these confidentiality and non-disclosure obligations.

20.    Additionally, as SEC-registered investment adviser representatives, Canter's employees are also subject to regulatory, professional, and ethical duties, including fiduciary obligations, that require them to keep Canter's confidential information secure.

21.    Canter's confidential and trade secret information includes, but is not limited to, confidential client lists and client data bases, confidential client financial positions and planning strategies, proprietary financial planning strategies and analyses, proprietary investment strategies, proprietary investment forecasts, proprietary tax planning analyses and projections, proprietary portfolio formulations, client pricing, client identifying and contact information, and Canter's proprietary marketing, advertising, and lead-generation strategies.

22.    Such information is highly valuable to Canter, as demonstrated by the significant financial success of Canter's business, and its efforts Canter takes to safeguard this information. It would be immensely harmful to Canter if such information was improperly obtained by any competitor or third party who may use such information not only to harm Canter and its clients, but also to obtain an unfair competitive advantage over Canter.

23.     Because Canter's business involves long term financial planning strategies that are carefully curated for clients using Canter's confidential, proprietary, and trade secret information, Canter's business depends on maintaining long-term relationships with its clients.

***Bernier's Employment with Canter***

24.     Bernier was employed as a Senior Wealth Advisor at Canter from January 3, 2019, until his resignation on October 23, 2024. In this capacity, Bernier regularly serviced Canter's clients and was trusted with access to Canter's confidential, proprietary, and trade secret information.

25.     As part of his employment with Canter, on January 3, 2019, Bernier executed an Employment Agreement setting forth the basic terms of his employment with Canter. A true and correct copy of the fully executed Employment Agreement is attached hereto as **Exhibit A**.

26.     As part of his employment, Bernier would be transitioning his pre-existing book of investment advisory clients to Canter ("Transitioning Clients"), where he would continue to provide the Transitioning Clients with investment advisory services, in addition to servicing new clients generated through his and Canter's marketing and business development efforts.

27.     As explained in the Employment Agreement, Bernier would receive a bi-weekly salary along with additional "Variable Compensation" comprised of two components: (1) an amount based on a percentage of the "gross investment advisory fee revenue" generated by Bernier's clients at Canter for whom Bernier was the "advisor of record" (the "Fee Revenue Compensation");[1] and (2) an amount equal to 10 percent of the "net investment advisory fee revenue" received by Canter that was attributable to Bernier and personnel associated with his office (the "Office Profit Compensation"). *See* Employment Agreement at 1.

---

[1] The Fee Revenue Compensation is further broken down into two percentage shares depending on whether it is generated from "Transitioning Clients" versus "New Clients." *See* Employment Agreement at 1.

*The Buyout Option*

28.    The Employment Agreement also contained a "Buyout" Option, whereby, upon Bernier's "voluntary, not-for-Cause termination from Canter," Canter "shall purchase the exclusive right to the gross investment advisory fee revenue specifically attributable certain clients" of Bernier (and his office). *See id.* at 2.

29.    Pursuant to the Buyout Option, "Canter has the first right of refusal to purchase the exclusive right to the gross investment advisory fee revenue specifically attributable to Transitioning Clients . . . at a price equal to 5 times the trailing 12 months' earnings before interest, tax, depreciation, and amortization," which the parties agreed "shall be deemed the 'Fair Market Value' of [Bernier's] Office." *Id.*

30.    The formula, agreed to and established in the Buyout Option with Bernier's knowledge and express assent, established a valuation basis for the business Bernier conducted as a Canter employee.

31.    The Buyout Option also included a bonus that would apply if, at the time of his termination, Bernier's office "ha[d] been directly managing not less than $250,000,000 in regulatory assets under management . . . for not less than [2] consecutive calendar quarters." *Id.* (second alteration in original) If this applied, "Canter shall additionally pay a bonus for the exclusive right to the gross investment advisory fee revenue specifically attributable to Transitioning Clients, New Clients, and any other clients of [Bernier's] Office . . . at an amount of 10% of the Fair Market Value of Your Office," where the "Fair Market Value" "shall be equal to 5 times the trailing 12 months' of Your Office's EBITDA." *Id.*

32.    The Buyout Option also includes a payment schedule whereby Canter would deliver the initial one-third of the buyout purchase price upon Bernier's termination date, with the balance to be delivered through quarterly installment payments subject to annual re-assessments of the Fair Market Value. *See id.* at 3.

*Bernier's Confidentiality Obligations to Canter*

33.    In connection with his Employment Agreement, Bernier also agreed to and accepted a "Confidentiality, Non-Solicitation & Non-Disparagement Agreement" (the "Confidentiality Agreement"). A true and correct copy of the Confidentiality Agreement executed by Bernier is attached hereto as **<u>Exhibit B</u>**.

34.    In the Confidentiality Agreement, Bernier "acknowledge[d]" that he "will have access to and learn much or all about Canter's trade secrets and/or confidential or proprietary information, including Client Information." Confidentiality Agreement at 1.

35.    "Client Information" is defined as "names, phone numbers, addresses, email addresses, advisory/transaction history, fee schedule information, and other information identifying facts and circumstances specific to the Client and relevant to services." *Id.*

36.    "Client Information" is part of Canter's confidential, proprietary, and trade secret information that Canter takes steps to protect from improper disclosure, as set forth above.

37.    Bernier "agree[d] and covenant[ed], during one year, to run consecutively, starting on the date of terminating, that [he] w[ould] not use any of Canter's trade secrets and/or confidential or proprietary information to directly or indirectly solicit the Clients of Canter, or to interrupt, disturb, or interfere with the relationships of Canter with its Clients." The term "Clients of Canter" was defined to exclude "Transitioning Clients" and "New Clients" as described in the Employment Agreement. *Id.*

38.    Bernier also agreed that "during one year, to run consecutively, starting on the date of termination that [he] w[ould] not disrupt, damage, impair, or interfere with the business of Canter by directly or indirectly soliciting, recruiting, attempting to recruit, or raiding the employees, or otherwise inducing the termination of employment of any employee of Canter through the use of trade secret information

and/or confidential or proprietary information of Canter or other unlawful means to directly or indirectly solicit the employees of Canter." *Id.*

39. The Confidentiality Agreement also requires Bernier to maintain and not disclose to third parties, all of Canter's "Confidential Information," as follows:

> IAR agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow it to be disclosed, published, communicated or made available, in whole or part, to any entity or person whatsoever . . . ; and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media or other resources containing any Confidential Information, or remove such documents, records, files, media or other resources from the premises or control of Canter, except as required in the performance of IAR's authorized duties to Canter or with the prior consent of an authorized officer acting on behalf of Canter.

*Id.* at 2.

40. Bernier's obligations regarding Confidential Information "commence[d] immediately upon IAR first having access to such Confidential Information . . . and shall continue during and after his/her employment by Canter until such time as such Confidential Information has become public knowledge other than as a result of IAR's breach of this Agreement or breach by those acting in concert with IAR or on IAR's behalf." *Id.* at 2–3.

41. Shortly after executing, and agreeing to, the Employment Agreement and Confidentiality Agreement, Bernier transferred his SEC investment adviser registration to be associated with Canter effective January 18, 2019.

42. Upon becoming a Canter employee, Bernier was also subject to the terms and requirements set forth in Canter's Employee Handbook.

43. As relevant here, Canter's Employee Handbook provides that:

The Company devotes significant time, energy, and expense to develop and acquire its trade secrets and confidential information. As an employee of the Company you will, during the course of your employment, have access to and become familiar with various trade secrets and confidential information which are owned by the Company. An employee shall not, directly or indirectly, disclose or use any of the foregoing information other than for the sole benefit of the Company, either during the term of your employment or at any other time thereafter. This information shall not be disclosed except through normal channels and with authorization. Any and all trade secrets or confidential information shall be returned to the Company during extended leaves of absence or upon termination of employment.

44.     In the ordinary course of employment, Canter employees are required to review, acknowledge, and agree to comply with the policies and requirements of the Employee Handbook, including the above obligation to maintain in strict confidence and not disclose all of Canter's confidential information and trade secrets.

45.     Bernier executed such an acknowledgement on May 9, 2022.

46.     Bernier therefore owed Canter confidentiality obligations during the tenure of his employment and, in accordance with the Confidentiality Agreement, continues to owe Canter such obligations to date.

47.     Moreover, as an employee of Canter, Bernier owed common law duties and obligations to Canter, including a duty of undivided loyalty.

48.     As a Senior Wealth Advisor servicing Canter's clients, Bernier had regular access to Canter's confidential, proprietary, and trade secret information, including through Canter's secure data management system, Box.

***Bernier Plots to Leave Canter and Evade the Buyout Option***

49.     Upon information and belief, beginning in the late summer and early fall of 2024, Bernier embarked on a carefully crafted and implemented plan to end his

association with Canter and abscond with Canter's confidential information and trade secrets for the knowing benefit of LPL. Bernier planned to solicit and service Canter's clients—defeating the Buyout Option—and solicit employees for his personal benefit and the benefit of LPL.

50.    On October 23, 2024, at approximately 7:00 a.m. (PDT) Bernier emailed a letter to his supervisor at Canter informing him that he was resigning "effective immediately."

51.    In his letter, Bernier provided his "new" contact information which identified LPL as his new employer, listed LPL's office in San Diego, and stated that any clients who contact Canter and inquire about him should be advised that he "moved to GWC Financial Advisors (LPL Financial)," thus signaling his intent to solicit Canter's clients to move their assets from Canter to LPL.

52.    That same day, October 23, Bernier's SEC investment adviser registration was associated with LPL, as reflected in publicly available investment adviser records.

53.    The almost nonexistent time lapse between Bernier's resignation from Canter and the transfer of his SEC registration to LPL illustrates that Bernier and LPL together had been planning, during the prior weeks, to consummate Bernier's plans and that both Defendants were actively taking steps during the weeks prior to October 23, 2024, to do so.

54.    By comparison, when Bernier was hired by Canter on January 3, 2019, his SEC registration was not successfully associated with Canter until more than two weeks later, on January 19, 2019.

55.    Additionally, in the email accompanying his October 23, 2024 resignation letter, Bernier advised he had left his work laptop locked up in the desk in his office, apparently placing it there the night before.

56.     Canter soon discovered, however, that Bernier had embarked on a months' long campaign of illicit and tortious conduct for which Bernier had no legitimate business purpose.

*Canter's Investigation of Bernier's Activities*

57.     Shortly after Bernier tendered his resignation, Canter became concerned Bernier might have improperly taken Canter's confidential information and/or trade secrets, including Canter's proprietary tax plans, allocations and models to solicit and service Canter's clients.  The timing and speed at which Canter's clients transferred their portfolios at the end of the year, raised further suspicion that confidential information, computer data, and trade secrets Canter had maintained to service those clients had been accessed, copied, taken, and/or destroyed.

58.     Canter therefore began reviewing activity logs of Bernier's activities within Canter's computer systems, including, but not limited to, its email servers, data management system, and computer networks, as well as on Bernier's laptop.

59.     Canter's initial investigation revealed shocking evidence that Bernier, since at least September 2024, had been taking steps to improperly access, use, and copy Canter's confidential and trade secret information, and then to cover it up by deleting the evidence.

60.     Canter uses a file storage utility known as "Box" as its core data management system, and the tool stores virtually everything relevant to Canter's business, including regulatory filings and records required to be maintained by federal and state law, as well as all of Canter's confidential, proprietary, and trade secret information.

61.     When Canter reviewed Bernier's activity within Box during the period from September through his resignation in October, it discovered he had taken several steps to both access a wide swath of Canter's proprietary information beyond what would be necessary to perform his duties, and to cover up the fact he was taking Canter's confidential and trade secret information.  For example, the Box activity for

September 13, 2024, demonstrates Bernier, in the early morning hours, accessed a Box folder containing confidential and trade secret information related to Canter's client lists and contact information. Bernier "un-synced" the Box folder, meaning it would no longer automatically update to show changes that were made within the folder locally from Bernier's computer, and then used the "Trash" function to remove several files and the folder itself from the system.

62. Upon information and belief, Bernier "un-synced" these folders in order to mask the fact that he was compiling Canter's confidential and trade secret information.

63. Canter subsequently searched Bernier's laptop hard drive for certain of the "Trashed" files and discovered that, although data indicated the files, at some point, had been stored on the laptop's memory, they were no longer available and had been deleted.

64. Bernier repeated this "un-sync" and "trash" process for several other folders and files on Box.

65. Canter's review of Bernier's Box activity also revealed that approximately two weeks before he resigned, Bernier downloaded to his laptop additional confidential and trade secret information concerning Canter's client lists.

66. Canter searched Bernier's laptop hard drive for those files but discovered that they, too, had been deleted.

67. Bernier also appears to have taken the additional step of emptying the "Trash Can" folder on his laptop that, upon information and belief, he did so to intentionally destroy evidence of the confidential and trade secret information he had taken from Box.

68. Bernier's deletion of Canter files violated Canter's policy, to access and destroy Canter's data, and spoliated evidence of his misdeeds.

69. Upon discovering this activity, Canter retained a forensic analyst to review Bernier's activities and laptop more thoroughly.

4927-2617-4217

COMPLAINT

70.    The ongoing forensic analysis that is ongoing has revealed egregious instances of Bernier accessing, manipulating, and even deleting Canter's confidential and trade secret information (in violation of Canter's policies as well as state and federal law), including without limitation:

- On October 22, 2024, Bernier accessed client reports, tax analyses, and client account information—all of which are confidential, proprietary, and trade secret information—for *more than two times* the number of clients he had reviewed, on average, during any single day in the preceding months;

- On October 21 and 22, 2024, Bernier accessed confidential and trade secret files concerning certain client tax analyses and printed them out — Canter's forensic investigation has confirmed that Bernier has retained and continues to use them;

- Between October 14 and 22, 2024, including until approximately 6:00 PM (PDT) on October 22, Bernier accessed confidential and trade secret information concerning client accounts and tax data through Canter's secure Schwab platform, reviewing multiple client files in quick succession;

- On October 11, 2024, Bernier systematically, and apparently in alphabetical order by client, reviewed confidential and trade secret information related to client tax analyses and financial account data for dozens of clients in quick succession.

71.    Bernier's conduct at these times was not typical, necessary, or appropriate for the performance of his duties as an investment adviser representative at Canter.

72.    There is no legitimate purpose for an investment adviser representative such as Bernier to systematically access client data for multiple clients within minutes, or even seconds, of accessing such data concerning other clients.

73.    Likewise, there is no legitimate purpose for an investment adviser representative such as Bernier to download, print, and then delete company files or information.

74.    In fact, such conduct was expressly prohibited by Canter's policies, including the Employee Handbook, which provides that employees may not "alter, copy, transmit, or remove Company information."

75.    Upon information and belief, Bernier engaged in these activities in order to download, copy, print, or otherwise obtain Canter's confidential and trade secret information in anticipation of his resignation from Canter and to retain such information for his personal use thereafter.

76.    Bernier further, upon information and belief, intentionally deleted or moved files and data to obscure, cover-up, and shield his misconduct from Canter's discovery.

77.    Many of the clients who were the subject of the confidential and trade secret information that Bernier improperly accessed, as set forth above, have since left Canter and moved their business to LPL where Bernier is now employed.

78.    Upon information and belief, Bernier, on his own behalf and for the benefit and with the knowing participation of LPL, has used said confidential and trade secret information he took from Canter to acquire Canter's clients and unfairly compete with Canter, and has otherwise disclosed such information to third parties.

79.    Bernier's conduct is a direct violation of his confidentiality obligations as set forth in the Canter Employee Handbook and the Confidentiality Agreement.

80.    Upon information and belief, Bernier has continued, and will continue unless enjoined, to use Canter's confidential, proprietary, and trade secret information to acquire clients and unfairly compete with Canter.

81. In fact, it has been publicly reported in various outlets, that Bernier intends to acquire nearly all of Canter's clients that he serviced to LPL.[2]

82. These publications also reveal LPL's knowing participation in encouragement of Bernier's misconduct, as LPL brazenly announced to the world Bernier would be taking Canter's clients.

83. In addition to his misappropriation and breaches, Bernier also engaged in other tortious and improper conduct intended to inflict harm on Canter and disrupt its business relations with is existing and prospective clients.

84. Canter has discovered that, prior to his resignation, Bernier ignored his duty to prepare, and deliver to clients, complete and accurate investment adviser reports concerning clients' portfolios and financial plans.

85. Canter required investment advisers like Bernier to prepare investment advisory reports for each client at certain points in time: (1) opening of the client account; (2) annually; or (3) at any time a significant change to strategy was implemented.

86. Canter required such reports be delivered to clients so the clients could review and understand the status of their portfolios, the impact of the particular strategy implemented, and the expected returns for the portfolio based on the chosen strategy (i.e., prospective profitability or returns realized in the portfolio).

87. Canter's policy required these reports be saved in PDF format and stored in the respective client's dedicated, and secured, folders within Canter's data management systems.

---

[2] *See* Press Release, LPL Financial, "LPL Financial Welcomes GWC Financial Advisors to Linsco Channel" (Nov. 5, 2024), *available at:* https://www.lpl.com/news-media/press-releases/lpl-financial-welcomes-gwc-financial-advisors-to-linsco-channel.html (reporting "approximately $165 million in advisory, brokerage and retirement plan assets" coming with Bernier. *See also* Stock Titan, "LPL Financial Welcomes GWC Financial Advisors to Linsco Channel" (Nov. 5, 2024), *available at*: https://www.stocktitan.net/news/LPLA/lpl-financial-welcomes-gwc-financial-advisors-to-linsco-iyaedyy7onnm.html (same).

88.    Canter's investigation of Bernier reveals that he failed to carry out this obligation and intentionally took steps to distort, cover-up, and even destroy aspects of these reports that would indicate poor performance for client portfolios.

89.    Specifically, Bernier prepared the reports as required using Canter's report-writing software.

90.    However, once created, Bernier intentionally altered said reports by excluding the final page of the report, the probability of success portion of the report, or the page indicating the projected returns for the portfolio under the strategy chosen.

91.    Bernier, on multiple occasions, excluded the probability of success page from reports for clients whose projected returns indicated a lack of profitability.

92.    Upon information and belief, Bernier sent reports to clients that had incorrect or missing data.

93.    Moreover, Bernier also failed to send any report to many other clients who should have received them.

94.    By not sending clients the complete reports and resigning from Canter, Bernier created the impression for such clients that Canter was not a worthy investment adviser, thus, harming Canter's reputation in the industry and goodwill among clients and prospective clients.

95.    Upon information and belief, Bernier took these steps because he planned to use the negative impression of Canter to acquire those clients or encourage them to move their accounts to him and LPL.

96.    In yet another effort to avoid Canter's detection, Bernier also appears to have engaged in text message communications with certain clients, in violation of Canter's policies.

97.    Canter prohibits employees from using unauthorized communications platforms to communicate with clients regarding business matters. Such prohibited platforms included, *inter alia*, text messages.

98.   Canter discovered Bernier had been using text messages to communicate with clients when an existing client emailed Bernier's Canter email address after his resignation and referred to earlier "texts."

***Canter Confronts Bernier and LPL***

99.   Upon information and belief, LPL had knowledge of and encouraged Bernier's misconduct at least as of the date of his resignation on October 23, 2024, at which time he became an LPL employee, but likely knew of, encouraged, and participated in that misconduct as it was happening.

100.   After discovering Bernier's misconduct within Canter's Box system, Canter sent a letter to Bernier demanding he immediately return all Canter information to Canter and cease and desist from any further use of such information or soliciting Canter's clients.

101.   Canter also demanded Bernier turn over all text messages, instant messages, and other communications in Bernier's possession with any Canter clients or otherwise concerning Canter's business.

102.   Bernier responded to Canter's letter, through counsel, on November 5, 2024.  In that response, Bernier denied any wrongdoing, denied having taken any Canter information, and falsely denied having any business-related text messages.

103.   Bernier also stated he had notified LPL about Canter's positions.

104.   As such, LPL was aware of both Bernier's confidentiality obligations to Canter and that he had breached such obligations by misappropriating Canter's confidential, proprietary, and trade secret information.

105.   On November 1, 2024, the same date of its letter to Bernier, Canter's Chief Compliance Officer contacted LPL and notified it about Bernier's misconduct and misappropriation of Canter's confidential, proprietary, and trade secret information and violation of his agreements, Canter's policies and procedures, industry standards, fiduciary obligations, and SEC regulations.

106.   Canter demanded that LPL immediately cease transferring clients from Canter using the stolen confidential, proprietary, and trade secret information.  LPL declined to do so, and, to date, has continued transferring clients from Canter with full knowledge of Bernier's misconduct.

107.   LPL has knowingly and intentionally accepted of the fruits of Bernier's misconduct, including stolen property in the form of Canter's confidential, proprietary, and trade secret information.

***Ongoing Harm to Canter***

108.   Canter has suffered significant losses since Bernier's resignation and its discovery of his misconduct.

109.   On just a single day in early November, Canter suffered a loss of more $20 million in AUM that was transferred away by clients who were previously serviced by Bernier.

110.   Each day since Bernier's resignation, Canter continues to suffer losses as clients previously serviced by Bernier unexpectedly and suddenly transfer their accounts away from Canter, stripping Canter of millions of dollars of revenue.

111.   Canter also is at risk of losing other investment adviser representatives, a key source of Canter's business.

112.   Upon information and belief, LPL has identified and recruited at least two Canter employees using the misappropriated confidential and trade secret information Bernier obtained as part of his theft campaign, including, but not limited to, information concerning the clients serviced by these employees.

**COUNT I**

**MISAPPROPRIATION OF TRADE SECRETS, 18 U.S.C. § 1836**

**(AS AGAINST ALL DEFENDANTS)**

113.   Canter repeats and incorporates herein each of the allegations set forth in Paragraphs 1 through 112 above as if fully set forth herein.

114.    Canter owns valid trade secrets, as defined in 18 U.S.C. § 1839(3), in its confidential and proprietary business information which includes both individually and collectively: client lists and client data bases, confidential client financial positions and planning strategies, proprietary financial planning strategies and analyses, proprietary investment strategies, proprietary investment forecasts, proprietary tax planning analyses and projections, proprietary portfolio formulations, client pricing, client identifying and contact information, and Canter's proprietary marketing, advertising, and lead-generation strategies.

115.    Canter takes and has taken reasonable measures to keep such information confidential and secret, including by means of employing technological and computer-based security methods like password protection and encryption. Canter also requires employees and personnel to agree to confidentiality agreements to maintain Canter's information in strict confidence and such employees are also subject to ethical and professional requirements to do the same.

116.    As a result of these reasonable measures, Canter's trade secret information is not generally known or publicly available, nor is it ascertainable by anyone outside of Canter.

117.    Canter provides services from its offices in California to clients across the United States including by means of telephone and internet services, thereby providing its services in interstate commerce.

118.    Bernier was under strict confidentiality obligations, including to not use, access, copy, or remove such trade secret information from Canter, or to not disclose to any third party such information.

119.    Bernier's conduct of unauthorized access, downloading, copying, printing, and utilizing Canter's trade secrets to solicit Canter's clients and employees, divert clients away from Canter, and to compete with Canter constitutes actual and ongoing misappropriation of Canter's trade secrets.

120. Bernier's disclosure of Canter's trade secrets to third parties constitutes a separate and additional act of actual and ongoing misappropriation of Canter's trade secrets.

121. Bernier took such actions willfully, maliciously, and in reckless disregard of Canter's rights, in that Bernier knew, or had reason to know, pursuant to the terms of the Confidentiality Agreement and the Canter Employee Handbook which he acknowledged, that Bernier was not authorized either to take or to disclose to third parties Canter's confidential and trade secret information.

122. LPL participated in and encouraged Bernier's acts of misappropriation and, upon information and belief, has received and used Canter's confidential and trade secret information with knowledge that such was misappropriated by Bernier.

123. Upon information and belief, LPL in coordination with Bernier, has used Canter's confidential and trade secret information to solicit Canter's clients, unfairly compete with Canter, and to solicit Canter's employees.

124. LPL took such actions willfully, maliciously, and in reckless disregard of Canter's rights, in that Bernier knew, or had reason to know, insofar as LPL continued to engage in such activities even after being put on notice by Canter and advised to immediately cease transferring clients from Canter to LPL.

125. Canter did not, at any time, consent to Defendants disclosures or use of Canter's confidential and trade secret information.

126. As a direct and proximate result of Defendants' misappropriation, Defendants have caused Canter actual loss and damages, including without limitation harm to Canter's business, goodwill and reputation, loss of client relationships, lost revenue and the like.

127. Unless enjoined by this Court, Defendants will continue to misappropriate and misuses Canter's confidential and trade secret information, thereby irreparably harming and damaging Canter.

128.   As a result of the foregoing, Canter is entitled to compensatory and punitive damages in an amount to be determined at trial, plus attorneys' and expert fees, costs, and pre- and post-judgment interest.

**COUNT II**

**MISAPPROPRIATION OF TRADE SECRETS UNDER CALIFORNIA'S UNIFORM TRADE SECRET LAW**

**(AS AGAINST ALL DEFENDANTS)**

129.   Canter repeats and incorporates herein each of the allegations set forth in Paragraphs 1 through 128 above as if fully set forth herein.

130.   This is a cause of action for Misappropriation of Trade Secrets under California's Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426, et seq., based upon Defendants' wrongful and improper use and disclosure of confidential and proprietary trade secrets information of Canter.

131.   Canter owns valid trade secrets in its confidential and proprietary business information which includes both individually and collectively: client lists and client data bases, confidential client financial positions and planning strategies, proprietary financial planning strategies and analyses, proprietary investment strategies, proprietary investment forecasts, proprietary tax planning analyses and projections, proprietary portfolio formulations, client pricing, client identifying and con-tact information, and Canter's proprietary marketing, advertising, and lead-generation strategies.

132.   Canter takes and has taken reasonable measures to keep such information confidential and secret, including by means of employing technological and computer-based security methods like password protection and encryption. Canter also requires employees and personnel to agree to confidentiality agreements to maintain Canter's information in strict confidence and such employees are also subject to ethical and professional requirements to do the same.

133.   As a result of these reasonable measures, Canter's trade secret information is not generally known or publicly available, nor is it ascertainable by anyone outside of Canter.

134.   Bernier was under strict confidentiality obligations, including to not use, access, copy, or remove such trade secret information from Canter, or to not disclose to any third party such information.

135.   Bernier's conduct of unauthorized access, downloading, copying, printing, and utilizing Canter's trade secrets to solicit Canter's clients and employees, divert clients away from Canter, and to compete with Canter constitutes actual and ongoing misappropriation of Canter's trade secrets.

136.   Bernier's disclosure of Canter's trade secrets to third parties constitutes a separate and additional act of actual and ongoing misappropriation of Canter's trade secrets.

137.   Bernier took such actions willfully, maliciously, and in reckless disregard of Canter's rights, in that Bernier knew, or had reason to know, pursuant to the terms of the Confidentiality Agreement and the Canter Employee Handbook which he acknowledged, that Bernier was not authorized either to take or to disclose to third parties Canter's confidential and trade secret information.

138.   LPL participated in and encouraged Bernier's acts of misappropriation and, upon information and belief, has received and used Canter's confidential and trade secret information with knowledge that such was misappropriated by Bernier.

139.   Upon information and belief, LPL in coordination with Bernier, has used Canter's confidential and trade secret information to solicit Canter's clients, unfairly compete with Canter, and to solicit Canter's employees.

140.   LPL took such actions willfully, maliciously, and in reckless disregard of Canter's rights, in that Bernier knew, or had reason to know, insofar as LPL continued to engage in such activities even after being put on notice by Canter and advised to immediately cease transferring clients from Canter to LPL.

141.    Canter did not, at any time, consent to Defendants disclosures or use of Canter's confidential and trade secret information.

142.    As a direct and proximate result of Defendants' misappropriation, Defendants have caused Canter actual loss and damages, including without limitation harm to Canter's business, goodwill and reputation, loss of client relationships, lost revenue and the like.

143.    Unless enjoined by this Court, Defendants will continue to misappropriate and misuses Canter's confidential and trade secret information, thereby irreparably harming and damaging Canter.

144.    The aforementioned acts of Defendants in wrongfully misappropriating Canter's trade secrets were, and continue to be, willful, malicious, warranting an award of reasonable attorneys' fees, as provided by Cal. Civ. Code § 3426.4, and exemplary damages, as provided by Cal. Civ. Code §§ 3294 and 3426.3(c).

**COUNT III**

**BREACH OF CONTRACT**

**(AS AGAINST DEFENDANT MICHAEL BERNIER)**

145.    Canter repeats and incorporates herein each of the allegations set forth in Paragraphs 1 through 144 above as if fully set forth herein.

146.    The Confidentiality Agreement was executed between Canter and Bernier on January 3, 2019, as a condition of Bernier's employment with Canter. The Confidentiality Agreement constitutes a valid and enforceable contract as between Canter and Bernier.

147.    Pursuant to the Confidentiality Agreement, Bernier agreed, among other things, not to use or disclose any of Canter's confidential information or trade secrets, unless expressly authorized *See* Confidentiality Agreement at 2.

148.    Pursuant to the Confidentiality Agreement, Bernier agreed, among other things, not to copy, retain, or remove from Canter's systems or its control any of

Canter's confidential information or trade secrets, unless expressly authorized. *See id.*

149.    These obligations survive Bernier's resignation and/or termination from Canter. *See id.*

150.    Bernier breached these obligations, as set forth above, by, *inter alia*, copying, retaining, and removing from Canter's systems and premises Canter's confidential information and trade secrets, and by deleting files containing such information, and, upon information and belief, by disclosing such information to third parties, including LPL.

151.    Additionally, pursuant to the Confidentiality Agreement, Bernier agreed, among other things, for a period of "one year, to run consecutively, starting on the date of terminating" to not use any of Canter's confidential or trade secret information, including Client Information as defined in the Confidentiality Agreement, in order to solicit, interrupt, disturb, or otherwise interfere with Canter's relationship with Canter's clients (not including Transitioning Clients, as defined in the Confidentiality Agreement). *See id.* at 1.

152.    Upon information and belief, Bernier breached this obligation, as set forth above, by, *inter alia*, using Canter's confidential information and trade secrets, including Client Information, for purposes of soliciting clients that are not "Transitioning Clients" as defined in the Confidentiality Agreement.

153.    Further, pursuant to the Confidentiality Agreement, Bernier agreed, among other things, for a period of "one year, to run consecutively, starting on the date of terminating" to not directly or indirectly solicit, recruit, attempt to recruit, or otherwise induce the termination of any employee of Canter through use of Canter's confidential and trade secret information.

154.    Upon information and belief, Bernier breached this obligation by making use of Canter's confidential and/or trade secret information to directly or indirectly solicit, recruit, or attempt to recruit at least two Canter employees.

155. The foregoing covenants and obligations were intended and necessary to protect Canter's legitimate business interests, including its reputation and goodwill, as well as its trade secrets and other confidential information.

156. Canter fully performed, or has substantially performed, all of its obligations and satisfied all conditions of performance owed under the Confidentiality Agreement.

157. Upon information and belief, Bernier's breaches are ongoing and continue as Bernier continues to use and disclose Canter's confidential and trade secret information for improper and illegitimate purposes.

158. Canter has suffered, and continues to suffer, damages as a result of Bernier's past and ongoing breaches, including without limitation, the loss of certain confidential information and trade secrets deleted by Bernier, loss of client relationships and revenue, loss of goodwill, loss of reputation, as well as damages sustained in connection with identifying, investigating, attempting to remedy the harm inflicted by Bernier.

159. As a result of the foregoing, Canter is entitled to compensatory and punitive damages in an amount to be determined at trial, plus attorneys' and expert fees, costs, and pre- and post-judgment interest.

## COUNT IV

### VIOLATION OF CALIFORNIA BUS. & PROF. CODE § 17200

### (AS AGAINST ALL DEFENDANTS)

160. Canter repeats and incorporates herein each of the allegations set forth in Paragraphs 1 through 159 above as if fully set forth herein.

161. Bernier engaged in unlawful, unfair, and fraudulent business acts and practices, including without limitation, misappropriating Canter's confidential, proprietary, and trade secret information, and deleting and manipulating information and data to conceal his misappropriation.

162.   LPL engaged in unlawful and unfair business acts and practices, including without limitation, encouraging, participating in, and knowingly accepting the fruits of Bernier's misappropriation of Canter's confidential, proprietary, and trade secret information, and using such information to solicit, acquire, and service Canter's clients and employees.

163.   Defendant's business acts and practices were fraudulent in that they were intended to conceal the material fact that Bernier had misappropriated Canter's confidential, proprietary, and trade secret information and a reasonable person would likely be deceived by such conduct.

164.   Defendants' business acts and practices were unfair in that the substantial harm suffered by Canter outweighs any justification Bernier or LPL may have for engaging in such acts.

165.   Defendants' business acts and practices were unlawful in that they are violation of, at a minimum, federal and state laws protecting confidential information and trade secrets.

166.   Canter has been harmed as a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business acts and practices and, as such, Canter is entitled to restitution to include all benefits Defendants have derived from the improper business acts and practices and injunctive relief restraining Defendants from engaging in further acts of unfair competition.  Pursuant to California Business and Professions Code §§ 17203 & 17204, Canter is entitled to temporary, preliminary, and permanent injunctive relief enjoining Defendants, and each of them from engaging in further conduct constituting unfair competition.  Canter will be further damaged in a like manner so long as Defendants' conduct continues.

**COUNT V**

**TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC RELATIONS**

**(AS AGAINST ALL DEFENDANTS)**

167.  Canter repeats and incorporates herein each of the allegations set forth in Paragraphs 1 through 166 above as if fully set forth herein.

168.  Canter had valuable and ongoing economic relationships with clients and had potential relationships with prospective clients.

169.  Canter invested significant resources, including its money, technology, and personnel, to cultivate and maintain its client relationships and to identify potential relationships with prospective clients.

170.  Such economic relationships had the potential for future benefit to Canter, including growth in revenue and appreciation to Canter's reputation and goodwill within the community.

171.  Bernier was aware of and knew about such relationships and, in fact, during his employment with Canter acted on Canter's behalf to service such relationships.

172.  LPL was aware of and knew about such relationships, including by virtue of its employment of Bernier and because Canter specifically requested that LPL stop transferring Canter's clients from Canter to LPL.

173.  Defendants were aware of and knew, or should have known, that such relationships provided concrete economic benefits to Canter and had a probability of providing future economic benefits to Canter.

174.  Bernier intentionally, or with a reckless disregard to the rights of Canter, acted to disrupt, interfere with, and destroy Canter's relationships with clients, including by, *inter alia*, (1) preparing incomplete and misleading investment advisory reports that failed to accurately inform clients about the probability of success of their financial plans; (2) intentionally deleting and removing from

investment advisory reports information concerning the prospective returns for client portfolios; (3) failing to deliver investment advisory reports to clients; (4) by misappropriating Canter's confidential, proprietary, and trade secret information and using such information to solicit Canter's clients to move their business away from Canter; and (5) by misappropriating and deleting from Canter's systems files and records containing Canter's confidential, proprietary, and trade secret information.

175. LPL intentionally, or with a reckless disregard to the rights of Canter, acted to disrupt, interfere with, and destroy Canter's relationships with clients, including by, *inter alia*, participating in, encouraging, and acting in coordination with Bernier to misappropriate Canter's confidential, proprietary, and trade secret and use such information to solicit Canter's clients to move their business away from Canter and to LPL, and continuing to do so even after LPL was notified and requested by Canter to cease doing so.

176. As a direct and proximate result of Bernier's interfering acts, Canter has suffered, and continues to suffer, damages and harm, including without limitation, the destruction and loss of client relationships, loss of revenue and economic losses, and loss of reputation and goodwill.

## COUNT VI
## BREACH OF FIDUCIARY DUTY
## (AS AGAINST DEFENDANT MICHAEL BERNIER)

177. Canter repeats and incorporates herein each of the allegations set forth in Paragraphs 1 through 176 above as if fully set forth herein.

178. Bernier was an employee and agent of Canter who occupied a position of trust and confidence with access to Canter's confidential, proprietary, and trade secret information.

179. In such a position, Bernier owed Canter fiduciary obligations to act at all times on Canter's behalf and in its interest.

180. Bernier breached his fiduciary obligation by, *inter alia*, misappropriating Canter's confidential, proprietary, and trade secret information for his own benefit and in order to solicit Canter's clients and compete with Canter.

181. Bernier breached his fiduciary obligation by, *inter alia*, using Canter's confidential, proprietary, and trade secret information for his own benefit and for that of third parties, and in order to compete with and inflict harm upon Canter.

182. As a direct and proximate result of Bernier's breach, Canter has suffered, and continues to suffer, damages as a result of Bernier's past and ongoing breaches, including without limitation, the loss of certain confidential information and trade secrets deleted by Bernier, loss of client relationships and revenue, loss of goodwill, loss of reputation, as well as damages sustained in connection with identifying, investigating, attempting to remedy the harm inflicted by Bernier.

**COUNT VII**

**BREACH OF DUTY OF LOYALTY**

**(AS AGAINST DEFENDANT MICHAEL BERNIER)**

183. Canter repeats and incorporates herein each of the allegations set forth in Paragraphs 1 through 182 above as if fully set forth herein.

184. Bernier was an employee and agent of Canter who occupied a position of trust and confidence with access to Canter's confidential, proprietary, and trade secret information.

185. In such a position, Bernier owed Canter a duty of undivided loyalty and to act at all times on Canter's behalf and in its interest, and to maintain the confidentiality of Canter's confidential, proprietary, and trade secret information, and to refrain from engaging in any act or omission calculated or likely to cause injury to Canter, from interfering with Canter's existing and prospective contractual and economic relationships, from disclosing trade secrets or other proprietary information or corporate opportunities, from directing clients away from Canter or

toward others, or from taking any action that was inimical to the best interests of Canter.

186.   Following his resignation from Canter, Bernier continued to owe a duty to Canter to refrain from doing any act or omission calculated or likely to disclose to third parties Canter's confidential, proprietary, and trade secret information acquired during his employment with Canter, to utilize Canter's trade secrets and proprietary information for the purpose of soliciting clients and customers of Canter, or to otherwise unfairly compete with Canter.

187.   Bernier breached his duty of loyalty and engaged in a course of conduct inconsistent with his duty of loyalty to protect the interests of Canter.

188.   As a direct and proximate result of Bernier's breach, Canter has suffered, and continues to suffer, damages as a result of Bernier's past and ongoing breaches, including without limitation, the loss of certain confidential information and trade secrets deleted by Bernier, loss of client relationships and revenue, loss of goodwill, loss of reputation, as well as damages sustained in connection with identifying, investigating, attempting to remedy the harm inflicted by Bernier.

## COUNT VIII
### VIOLATION OF CALIFORNIA PENAL CODE § 496
### (AS AGAINST ALL DEFENDANTS)

189.   Canter repeats and incorporates herein each of the allegations set forth in Paragraphs 1 through 188 above as if fully set forth herein.

190.   California Penal Code § 496(a) provides that any person "who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished."

191.   California Penal Code § 496(c) provides that "any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

192.   Canter's confidential and trade secret information constitutes "property" within the meaning of California Penal Code Sections 496(a) and (c).

193.   Bernier misappropriated Canter's confidential and trade secret information and such misappropriation constitutes a "theft" within the meaning of California Penal Code Section 496(a).

194.   Defendants knew that Canter's confidential and trade secret information had been stolen or obtained unlawfully by Bernier, including because Canter specifically advised both Bernier and LPL that Bernier had misappropriated Canter's confidential and trade secret information.

195.   With such knowledge, Defendants have refused or failed to return Canter's property, and continue to withhold such property from Canter, and to retain and use such property in violation of Canter's rights.

196.   Canter has been injured by Defendants conduct including, without limitation, by the loss of certain confidential information and trade secrets destroyed by Bernier through his deletion of electronic files, loss of Canter's exclusive right to possess and use its property, the loss of client relationships and revenue, loss of goodwill, and loss of reputation.

197.   As a result, Canter is entitled to recover from Defendants treble damages, costs, and reasonable attorneys' fees as provided in California Penal Code Section 496(c).

**COUNT IX**

**VIOLATION OF CALIFORNIA PENAL CODE § 502**

**(AS AGAINST ALL DEFENDANTS)**

198.   Canter repeats and incorporates herein each of the allegations set forth in paragraphs 1 through 197, inclusive, of this Compliant as if fully set forth herein.

199.   Canter is informed and believes that Defendants violated §502(c)(5) of the California penal Code by knowingly, and without permission, accessing Canter's data, software, computer and/or computer systems.

200.   Canter is informed and believes and based thereon alleges that Defendants also violated §502(c)(1) of the California penal Code by accessing and using Canter's data, software, computer, and/or computer systems to wrongfully obtain and transfer data.

201.   Canter has suffered damage by reason of Defendant's violation of the provisions of Penal Code §502(c).

202.   Under California Penal code §502(e), Canter is entitled to compensatory damages, injunctive relief or other equitable relief, and attorney's fees pursuant to Penal Code §502(e)(2) for Defendants' violations of California Penal Code §502(c), including the stolen property and information in the possession of any Defendant.

203.   Defendants' conduct as described herein evidences that Defendants, and each of them, have acted willfully, fraudulently, and maliciously within the meaning of Civil Code §3294 so as to entitle Canter to an award of punitive damages pursuant to California Penal Code §502(e)(4).

**COUNT X**

**CONSPIRACY**

**(AS AGAINST ALL DEFENDANTS)**

204.   Canter repeats and incorporates herein each of the allegations set forth in paragraphs 1 through 203, inclusive, of this Compliant as if fully set forth herein.

205.   Canter is informed and believes that Defendants, and each of them, conspired and agreed among themselves to do the acts described herein; to induce Bernier's breach of his contractual relationship with Canter, his fiduciary duty, his duty of loyalty to Canter while employed; to interfere with Canter's contractual relationships with its clients, customers, and employees, to misappropriate Canter's confidential, proprietary, and trade secret information; to access, use and destroy Canter's data, software, computer, and/or computer systems; and to otherwise unfairly compete with Canter.

206.   Canter is informed and believes that Defendants, and each of them committed the above-referenced acts to and in furtherance of a conspiracy to induce breaches of Canter's contracts, and prospective economic relations with Bernier's and Canter's clients; Bernier's duty of loyalty to Canter and fiduciary obligations; to misappropriate Canter's confidential, proprietary, and trade secret information and use that information to solicit Canter's clients to move their business from Canter to LPL; to access, use, and destroy Canter's data, software, computer, and/or computer systems; and to otherwise unfairly compete with Canter.

207.   Canter is informed and believes that Defendants furthered the conspiracy through their own acts of cooperation, assistance, and/or encouragement to the conspiracy, and/or ratified and adopted the acts of the other conspirators in carrying out the conspiracy.

208.   As a proximate result of the wrongful conduct of each Defendant, Canter has suffered, and continues to suffer, actual damages in an amount presently undetermined but believed to be well in excess of the jurisdictional minimum required for this action.

209.   The wrongful acts of Defendants were willful, oppressive, fraudulent and malicious, Canter is therefore entitled to punitive damages according to proof at the time of trial.

# **PRAYER FOR RELIEF**

WHEREFORE, Canter prays for the following relief:

1.      Judgment in favor of Canter and against Bernier on all claims for relief alleged herein.

2.      Preliminary and permanent injunctive relief order, enjoining, and restraining Bernier, and all those acting in concert with or on behalf of him, from: (1) retaining, disclosing, or in any using any of Canter's confidential, proprietary, and/or trade secret information as described herein; (2) compelling the return to Canter of any and all records, files, data, or information in whatever form received, obtained, removed, or copied by Bernier from Canter; and (3) directing Bernier to turn over any and all proceeds obtained by Bernier, or those acting in concert with or on behalf of him, from his misappropriation of Canter's confidential, proprietary, and/or trade secret information.

3.      An order directing Bernier to account for all gains, profits and advantages derived from his misappropriation of Canter's confidential, proprietary, and trade secret information.

4.      An order directing Bernier to disgorge all profits and ill-gotten gains derived from his unlawful conduct.

5.      An order awarding three times its actual and compensatory damages as proven at trial as provided in California Penal Code Section 496(c).

6.      An order awarding exemplary and punitive damages as permitted by law.

7.      An order awarding Canter costs of suit, pre- and post-judgment interest, and reasonable attorneys' fees.

8.     An order awarding such other and further relief as the Court deems just and proper.

Dated: December 23, 2024          THOMPSON HINE LLP


                                  By: */s/ Amanda R. Washton*
                                      John A. Conkle
                                      Amanda R. Washton
                                      Ernest Edward Badway (*pro hac vice forthcoming*)
                                      Brian P. Lanciault, Jr. (*pro hac vice forthcoming*)

                                      Attorneys for Plaintiff Canter Strategic Wealth Management, LLC

1

## **<u>JURY TRIAL DEMANDED</u>**

2

3        Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Canter

4   demands a trial by jury on all claims and issues so triable.

5

6   Dated: December 23, 2024           THOMPSON HINE LLP

7

8

9                                      By: */s/ Amanda R. Washton*

10                                          John A. Conkle
                                            Amanda R. Washton
11                                          Ernest Edward Badway (*pro hac vice*
                                            *forthcoming*)
12                                          Brian P. Lanciault, Jr. (*pro hac vice*
13                                          *forthcoming*)

14                                          Attorneys for Plaintiff Canter Strategic
15                                          Wealth Management, LLC

16

17

18

19

20

21

22

23

24

25

26

27

28